**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION**

| | |
|---|---|
| LYNN FISH, CHARMAINE PEARCE, and ALARIE BOWERMAN, on behalf of themselves and all others similarly situated, | Case No. 2:24-cv-00100-HEA |
| Plaintiffs, | Jury Demand |
| v. | Class Action |
| WALSWORTH PUBLISHING COMPANY, INC, | |
| Defendant. | |

**CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Lynn Fish, Charmaine Pearce, and Alarie Bowerman (collectively "Plaintiffs"), bring this Class Action Complaint against Walsworth Publishing Company, Inc. ("Walsworth" or "Defendant"), on behalf of themselves and all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

**INTRODUCTION**

1.     Plaintiffs bring this class action complaint against Defendant for its failure to properly secure and safeguard the personally identifiable information ("PII") of Plaintiffs and other similarly situated customers of Defendant ("Class Members"), including their names, payment card number, expiration dates, and security codes (the "Data Breach").[1]

2.     According to the sample notice of data breach filed Defendant with the Vermont and California Attorneys General, Defendant discovery on February 9, 2024, of "a potential data

---

[1] Exhibit A, Defendant's Notification Letter to Plaintiffs.

security incident involving its website and purchasing page."[2]

3.      Though Defendant admits that payment information, including security codes and expiration dates, were potentially affected, its notification letter fails to illuminate when the malicious activity took place and how long the hackers had access to Defendant's website and purchasing page. Given that inclusion of this information is standard practice, it is likely that Defendant simply does not know.

4.      The lack of information regarding when the hackers first infiltrated Defendant's website and how long they had such access strongly implies that Defendant failed to implement the proper logging, monitoring, and alerting systems necessary to identify malicious activity in a timely manner.

5.      After the Data Breach, Defendant sent notification letters to affected individuals in which it offered them access to identity theft protection services, strongly implying that Defendant understands the harm that Plaintiffs and Class Members must now face.

6.      Moreover, Defendant instructed Plaintiffs and the Class to "review your current and past credit and debit card account statements for discrepancies or unusual activity" and to "call the bank that issued the credit or debit card immediately" if they found any such activity.[3]

7.      Notwithstanding that Defendant knew about the malicious activity by February 9, 2024, it waited an astounding nine and a half months to notify affected persons. The delay robbed Plaintiffs and the proposed Class of an opportunity to protect themselves from fraudulent activity.

---

[2] Office of the Vt. Atty. Gen., https://ago.vermont.gov/sites/ago/files/documents/2024-11-22%20Walsworth%20Publishing%20Company%20Data%20Breach%20Notice%20to%20Consumers.pdf (last visited Feb. 14, 2025); Office of the Cal. Atty. Gen., https://oag.ca.gov/system/files/Walsworth%20Publishing%20Company%20-%20Notice%20of%20Data%20Security%20Event%20-%20CA_0.pdf (last visited Dec. 4, 2024).
[3] *Id.*

8.      Moreover, the delay was in stark contrast to Defendant's responsibilities under the data breach notification statutes that exist in every state. For example, West Virginia law requires that Defendant's notify affected persons without "unreasonable delay." W. Va. Code § 46A-2A-102(a). The same is true in Missouri. Mo. Rev. Stat. Ann. § 407.1500.2(1)(a).

9.      When interpreting what a "reasonable delay" might be, courts should consider that every state that expressly lists a deadline has determined that the deadline should be between thirty and sixty days. Moreover, initial notice to the SEC is four days.

10.      Moreover, the delays betray the absence of a reasonable cybersecurity incident response plan, which is an elementary aspect of any reasonable cybersecurity program and is designed to ensure that companies faced with data breaches are prepared to appropriately respond and to meet its legal obligations to timely notify affected persons. Indeed, the lack of a timely response to a cyberattack shows that a company has failed to get even the basics right, which likely means it also failed to get the more difficult, technical components of a cybersecurity program right as well.

11.      Defendant's failure to timely notify affected persons left them blind, unknowing that they faced the significant risk of fraudulent activity such that they could have protected themselves. In other words, many Class Members have lost money and time from fraudulent charges because of Defendant's failure to timely notify.

## PARTIES

12.      Plaintiff Fish is a resident and citizen of West Virginia, where she intends to remain.

13.      Plaintiff Pearce is a resident and citizen of California, where she intends to remain.

14.      Plaintiff Bowerman is a resident and citizen of Arkansas, where she intends to remain.

3

15.     Defendant Walsworth Publishing Company, Inc. is a corporation organized under the laws of Missouri, with its principal place of business at 306 N. Kansas Avenue, Marceline, Missouri.

16.     Defendant's registered agent is Cogency Global Inc. at 406 N. Main Street, Suite B, Rolla, Missouri, 65401.

## JURISDICTION AND VENUE

17.     The Court has general subject matter jurisdiction over this civil action under the Class Action Fairness Act, 28 U.S.C. § 1332(d) because the amount in controversy is easily more than $5,000,000 and minimal diversity exists. Specifically, the Data Breach affected at least 107,707 people. Minimal diversity exists because Plaintiff Fish is a citizen of West Virginia, Plaintiff Pearce is a citizen of California, and Plaintiff Bowerman is a citizen or Arkansas— whereas Defendant is a citizen of Missouri. Moreover, the amount in controversy is met here because even nominal damages of $50 per Class Member would result in damages of over $5,000,000.

18.     This Court has personal jurisdiction over Defendant because its headquarters is in this State.

19.     Venue is proper in this Court because Plaintiffs resides in this District and Division and a substantial portion of the events giving rise to this Action occurred here.

## ADDITIONAL FACTUAL ALLEGATIONS

20.     The information held by Defendant in its computer systems at the time of the Data Breach included the unencrypted PII of Plaintiffs and Class Members, which it collected in the course of its business.

21.     Defendant made promises and representations to Plaintiffs and Class Members that their PII would be kept safe and confidential, and that the privacy of that information would be

4

maintained.

22.     Plaintiffs' and Class Members' PII was provided to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

23.     Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiffs and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep consumer's PII safe and confidential.

24.     Defendant had obligations created by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTCA"), industry standards, and representations made to Plaintiffs and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

25.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

**Defendant's Data Breach Was Imminently Foreseeable**

26.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store PII, like Defendant, preceding the date of the Data Breach.

27.     Data thieves regularly target institutions like Defendant due to the highly sensitive information in their custody. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

28.     In 2023, a record 3,205 data breaches occurred in the United States, resulting in

5

about 349,221,481 sensitive records being exposed, a greater than 100% increase from 2019.[4]

29.     As a custodian of PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiffs and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiffs and Class Members because of a breach.

30.     Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

31.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

32.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data in its systems, amounting to potentially thousands of individuals' detailed PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

33.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

34.     The ramifications of Defendant's failure to keep secure the PII of Plaintiffs and Class Members are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

---

[4]     Identity Theft Res. Ctr., *2023 Data Breach Report* (January 2024), https://www.idtheftcenter.org/publication/2023-data-breach-report/ (last accessed December 9, 2024).

**Defendant Had a Duty to Plaintiffs and Class Members to Secure Private Information**

35.    At all relevant times, Defendant had a duty to Plaintiffs and Class Members to properly secure their PII, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiffs and Class Members, and to promptly notify Plaintiffs and Class Members when Defendant became aware that their PII may have been compromised.

36.    Defendant's duty to use reasonable security measures arose because of the clear foreseeability of data breaches, as well as the special relationship that existed between Defendant, on the one hand, and Plaintiffs and the Class Members, on the other hand. That special relationship arose because Plaintiffs and the Members of the Class relied on Defendant to secure their PII when they entrusted Defendant with the information required to receive services from Walsworth.

37.    Defendant had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, Defendant breached its common law, statutory, and other duties owed to Plaintiffs and Class Members.

38.    Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

- Maintaining a secure firewall configuration;

- Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

- Monitoring for suspicious or irregular traffic to servers;

- Monitoring for suspicious credentials used to access servers;

- Monitoring for suspicious or irregular activity by known users;

- Monitoring for suspicious or unknown users;

- Monitoring for suspicious or irregular server requests;

- Monitoring for server requests for PII;

- Monitoring for server requests from VPNs; and

- Monitoring for server requests from Tor exit nodes.

**Value of Personally Identifiable Information**

39.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[5] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[6]

40.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[7]

41.     The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200,

---

[5] 17 C.F.R. § 248.201 (2013).

[6] *Id.*

[7] Anita George, *Your Personal Data Is for Sale on The Dark Web. Here's How Much It Costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.

and bank details have a price range of $50 to $200.[8] According to the Dark Web Price Index for 2021, payment card details for an account balance up to $1,000 have an average market value of $150, credit card details with an account balance up to $5,000 have an average market value of $240, stolen online banking logins with a minimum of $100 on the account have an average market value of $40, and stolen online banking logins with a minimum of $2,000 on the account have an average market value of $120.[9]

42.     The dark web is an unindexed layer of the internet that requires special software or authentication to access.[10] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[11] This prevents dark web marketplaces from being easily identifiable to authorities or those not in the know.

43.     Nevertheless, because data breaches inherently mean that the data was stolen by cybercriminals and identity thieves, further disclosure to the dark web only re-publishes the data to even more cybercriminals, thus exacerbating the already existing wrongful disclosure.

44.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information,

---

[8] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.

[9] Zachary Ignoffo, *Dark Web Price Index 2021*, PRIVACY AFFAIRS (June 10, 2023), https://www.privacyaffairs.com/dark-web-price-index-2021.

[10] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-is-the-dark-web.

[11] *Id.*

personally identifiable information . . . [is] worth more than 10x on the black market."[12]

45.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[13]

**Defendant Failed to Comply with FTC Guidelines**

46.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the FTCA, 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

47.     In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any

---

[12] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.
[13] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

48.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

49.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

50.    As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security practices, or to appropriately prepare to face a data breach and respond to it in a timely manner. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

51.    Defendant was at all times fully aware of its obligation to protect the PII of consumers under the FTC Act yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly,

Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

**Defendant Failed to Comply with Industry Standards.**

52.    Experts studying cybersecurity routinely identify institutions that store PII like Defendant as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

53.    Some industry best practices that should be implemented by institutions dealing with sensitive PII, like Defendant, include, but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, implementing reasonable systems to identify malicious activity, implementing reasonable governing policies, and limiting which employees can access sensitive data. As evidenced by the Data Breach and its timeline, Defendant failed to follow some or all these industry best practices.

54.    Other best cybersecurity practices that are standard at large institutions that store PII include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points.

55.    Moreover, a properly trained helpdesk that understands how to face social engineering attacks is an expected part of all cybersecurity programs.

56.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation

PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

57.    Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**Common Injuries & Damages**

58.    Because of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); and (d) the continued risk to their PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' PII.

**The Data Breach Increases Victims' Risk of Identity Theft.**

59.    Plaintiffs and Class Members are at a heightened risk of identity theft, especially because Defendant's failures resulted in Plaintiffs' and Class Members' payment card information falling into the hands of identity thieves.

60.    The unencrypted PII of Class Members has already or will end up for sale on the dark web because that is the *modus operandi* of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to even further

identity thieves who purchase the PII for the express purpose of conducting financial fraud and identity theft operations.

61.    Further, the standard operating procedure for cybercriminals is to use some data, like the payment card information here, to access "fullz packages" of that person to gain access to the full suite of additional PII that those cybercriminals have access through other means. Using this technique, identity thieves piece together full pictures of victim's information to perpetrate even more types of attacks.[14]

62.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

63.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it

---

[14] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

**Loss of Time to Mitigate Risk of Identity Theft and Fraud**

64.     Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and a Defendant arguing that the individual failed to mitigate damages.

65.     The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiffs' and Class Members' payment card information is affected.

66.     Indeed, as Judge Frank Easterbrook has thoughtfully opined, "plaintiffs have standing because the data theft may have led them to pay money credit-monitoring services, because unauthorized withdrawals from their accounts cause a loss (the time value of money) even when banks later restore the principal, and because the value of one's own time needed to set things straight is a loss from an opportunity-cost perspective. These injuries justify damages, just as they support standing." *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 828 (7th Cir. 2018).

67.     And though data breach defendants often attempt to diminish the harm their failures cause, Judge Easterbrook also pointed out that "[l]osing the use of money for three days may be a trifle to some people (though to other it may be a calamity), but a trifling loss suffices under California law." *Id.* at 829.

68.     By spending this time, data breach Plaintiffs were not manufacturing their own harm. Rather, as Judge Easterbrook explained, they took necessary steps to set things straight.

Moreover, these steps were taken at Defendant's direction.

69.     Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts and health insurance statements for any indication of fraudulent activity, which may take years to detect.

70.     These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[15]

71.     These efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[16]

**The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary**

72.     Based on the value of the information stolen, the data either has or will be sold to cybercriminals whose mission it is to perpetrate identity theft and fraud. Even if the data is not

---

[15] *See* U.S. Gov't Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[16] *See* Fed. Trade Comm'n, *Identity Theft.gov*, https://www.identitytheft.gov/Steps.

posted online, these data are ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

73.    Such fraud may go undetected for years; consequently, Plaintiffs and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

74.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

**Plaintiffs' Experiences**

***Plaintiff Lynn Fish***

75.    Plaintiff Lynn Fish provided her PII to Defendant as a condition of using its online purchasing site.

76.    At the time of the Data Breach, Defendant retained Ms. Fish's PII in its system.

77.    Plaintiff Fish purchased items on Defendant's website with the understand that her payment card information would be kept secure using commercially reasonable cybersecurity measures and that her payment card information would be free from misuse, including free from disclosure to cybercriminals—as such persons are the exact people from whom the expected cybersecurity controls are designed to protect Plaintiff Fish.

78.    Plaintiff Fish's PII was compromised in the Data Breach and stolen by identity thieves and fraudsters who illegally accessed Defendant's network for the specific purpose of

17

targeting the PII.

79.     Plaintiff Fish takes reasonable measures to protect her payment card information.

80.     Plaintiff Fish suffered actual injury in the form of a severe privacy invasion because of her PII, including her payment card information, falling into the hands of identity thieves whose mission it is to use that information to perpetrate identity theft and financial fraud.

81.     Plaintiff Fish suffered lost time, interference, and inconvenience because of the Data Breach and has experienced stress and anxiety due to increased concerns for the loss of her privacy and because she knows she must now face a substantial increase in identity theft and financial fraud attempts.

82.     Plaintiff Fish has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially her name and payment card information, being placed in the hands of criminals whose mission it is to misuse that data.

83.     Moreover, Defendant has must continue spending hours of her personal time going through all her past transactions to look for fraudulent activity.

84.     Indeed, Plaintiff Fish has had to cancel and get new cards twice due to suspicious activity on her account. This work required her to spend even more time beyond mitigation efforts by working with her bank to address the suspicious activity. Moreover, because she has already seen the effects of Defendant's failures, she continues to monitor her accounts daily.

85.     Further, the stress and anxiety caused by this Data Breach is significantly enhanced because Defendant failed to include any information regarding when the hackers first accessed its website purchasing page, so Plaintiff Fish does not actually know how far back she is supposed to search for fraudulent charges. The lack of understanding and certainty has exacerbated her injuries.

86.     Defendant obtained and continues to maintain Plaintiff Fish's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

87.     Because of the Data Breach, Plaintiff Fish anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Fish is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

88.     In addition to the significantly increased risk of identity theft and financial fraud that Plaintiffs must now face because of Defendant's failures, and in additional to the significant invasion of her privacy, Plaintiffs has already begun to see the effects of the Data Breach.

***Plaintiff Charmaine Pearce***

89.     Plaintiff Pearce was required to provide and did provide her PII to Defendant as a condition of receiving services from Walsworth.

90.     To date, Defendant has done next to nothing to adequately protect Plaintiff Pearce and Class Members, or to compensate them for their injuries sustained in this Data Breach particularly given the fact that Plaintiff Pearce's PII has already been "impacted" in the Data Breach and likely been made available on the dark web to anyone wishing to purchase it.

91.     The fraud and identity monitoring services offered by Defendant places the burden squarely on Plaintiff Pearce and Class Members by requiring them to expend time signing up for the service.

92.     Nor has Defendant compensated Plaintiff Pearce and Class Members for the time they will spend monitoring their accounts, placing credit freezes and fraud alerts, changing online passwords and other actions.

93.     Plaintiff Pearce and Class Members have been further damaged by the compromise

of their PII in the Data Breach which was "impacted" and is in the hands of cybercriminals who illegally accessed Defendant's network for the specific purpose of targeting the PII.

94.     Plaintiff Pearce typically takes measures to protect her PII and is very careful about sharing her PII. Plaintiff Pearce has never knowingly transmitted unencrypted PII over the internet or other unsecured source.

95.     Plaintiff Pearce stores any documents containing her PII in a safe and secure location, and she diligently chooses unique usernames and passwords for her online accounts.

96.     As a result of the Data Breach, Plaintiff Pearce has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach. In response to the Data Breach, Plaintiff Pearce has spent significant time monitoring her accounts and credit score, changing her online account passwords and verifying the legitimacy of the Notice and researching the Data Breach. This is time that was lost and unproductive and took away from other activities and duties.

97.     Specifically, since the date of the breach Plaintiff Pearce has spent over twenty-four (24) hours taking action to mitigate the harm she has suffered. Plaintiff Pearce (1) has spent, and continues to spend, considerable time and effort actively monitoring her accounts and credit; and (2) she has lost sleep due to the stress and anxiety she now suffers from the fear of her PII being exposed, misused and sold on the black market.

98.     Furthermore, Plaintiff Pearce's information was used to open bank accounts, apply for credit cards, and enroll in subscription services, all without her knowledge and permission.

99.     Plaintiff Pearce has also experienced an increase in spam emails since the disclosure of her PII.

100.     Plaintiff Pearce suffered lost time, annoyance, interference, and inconvenience as a

result of the Data Breach and has anxiety and increased concerns for the loss of her privacy, especially after her information was used multiple times by unauthorized individuals.

101.    Plaintiff Pearce suffered emotional distress and increased stress and anxiety as a result of the Data Breach because of the actions she has been forced to undertake, the loss of control over her most intimate information, and the fact that she must remain vigilant for the remainder of her life.

102.    Plaintiff Pearce has suffered imminent and impending injury arising from not only the increased risk, but also the existence of fraud, identity theft, and misuse resulting from her PII being placed in the hands of criminals.

103.    Defendant obtained and continues to maintain Plaintiff Pearce's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure. Defendant required the PII from Plaintiff Pearce as a condition of receiving services from Walsworth. Plaintiff Pearce, however, would not have entrusted her PII to Defendant had she known that it would fail to maintain adequate data security. Plaintiff Pearce's PII was compromised and disclosed as a result of the Data Breach.

104.    As a result of the Data Breach, Plaintiff Pearce anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Pearce is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

***Plaintiff Alarie Bowerman***

105.    Plaintiff Bowerman provided her PII to Defendant as a condition of using its online purchasing site.

106.    At the time of the Data Breach, Defendant retained Ms. Bowerman's PII in its

system.

107.    Plaintiff Bowerman purchased items on Defendant's website with the understand that her payment card information would be kept secure using commercially reasonable cybersecurity measures and that her payment card information would be free from misuse, including free from disclosure to cybercriminals—as such persons are the exact people from whom the expected cybersecurity controls are designed to protect Plaintiff Bowerman.

108.    Plaintiff Bowerman's PII was compromised in the Data Breach and stolen by identity thieves and fraudsters who illegally accessed Defendant's network for the specific purpose of targeting the PII.

109.    Plaintiff Bowerman takes reasonable measures to protect her payment card information.

110.    Plaintiff Bowerman suffered actual injury in the form of a severe privacy invasion because of her PII, including her payment card information, falling into the hands of identity thieves whose mission it is to use that information to perpetrate identity theft and financial fraud.

111.    Plaintiff Bowerman suffered lost time, interference, and inconvenience because of the Data Breach and has experienced stress and anxiety due to increased concerns for the loss of her privacy and because she knows she must now face a substantial increase in identity theft and financial fraud attempts.

112.    Plaintiff Bowerman has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially her name and payment card information, being placed in the hands of criminals whose mission it is to misuse that data.

113.    Moreover, she must continue spending hours of her personal time going through all

her past transactions to look for fraudulent activity.

114.    Further, the stress and anxiety caused by this Data Breach is significantly enhanced because Defendant failed to include any information regarding when the hackers first accessed its website purchasing page, so Plaintiff Bowerman does not actually know how far back she is supposed to search for fraudulent charges. The lack of understanding and certainty has exacerbated her injuries.

115.    Defendant obtained and continues to maintain Plaintiff Bowerman's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

116.    Because of the Data Breach, Plaintiff Bowerman anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Bowerman is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

117.    In addition to the significantly increased risk of identity theft and financial fraud that Plaintiffs must now face because of Defendant's failures, and in additional to the significant invasion of her privacy, Plaintiffs has already begun to see the effects of the Data Breach.

## CLASS ALLEGATIONS

118.    Pursuant to the Federal Rules of Civil Procedure 23(b)(1), 23(b)(3), Plaintiffs brings this action on behalf of themselves and on behalf of all members of the proposed class defined as:

> **Nationwide Class:**
> All individuals PII was compromised in the Data Breach and to whom Defendant sent an individual notification that they were affected by the Data Breach.
>
> **California Subclass:**
> All residents of California who Defendant has identified as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach.

119.     Excluded from the Class and Subclass are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

120.     Plaintiffs reserves the right to amend the definition of the proposed Class or to add a subclass before the Court determines whether certification is appropriate.

121.     The proposed Class meets the criteria certification under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3).

122.     <u>Numerosity.</u> The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiffs believes the proposed Class includes thousands of individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class Members is unknown to Plaintiffs but may be ascertained from Defendant's. The number, however, reportedly exceeds 107,000 individuals.

123.     <u>Commonality.</u> There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.   Whether Defendant engaged in the conduct alleged herein;

    b.   Whether Defendant's conduct violated the FTC Act;

    c.   When Defendant learned of the Data Breach;

    d.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

e.  Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

f.  Whether Defendant's data security systems, prior to and during the Data Breach, were consistent with industry standards;

g.  Whether Defendant owed duties to Class Members to safeguard their PII;

h.  Whether Defendant breached their duties to Class Members to safeguard their PII;

i.  Whether hackers obtained Class Members' PII via the Data Breach;

j.  Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

k.  Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

l.  Whether Defendant knew or should have known its data security systems and monitoring processes were deficient;

m.  What damages Plaintiffs and Class Members suffered as a result of Defendant's misconduct;

n.  Whether Defendant's conduct was negligent;

o.  Whether Defendant breached contracts it had with its clients, which were made expressly for the benefit of Plaintiffs and Class Members;

p.  Whether Plaintiffs and Class Members are entitled to damages;

q.  Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

r.  Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a

constructive trust.

124.    <u>Typicality.</u> Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class Member, was compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Defendant. Plaintiffs is advancing the same claims and legal theories on behalf of themselves and all other Class Members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of Class Members arise from the same operative facts and are based on the same legal theories.

125.    <u>Adequacy of Representation.</u> Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

126.    <u>Predominance.</u> Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members. For example, all of Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

127.    <u>Superiority.</u> A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual

Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

128.    Class certification is also appropriate. Defendant has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

129.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach, as is evident by Defendant's ability to send those individuals notification letters.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE AND NEGLIGENCE PER SE
### (On Behalf of Plaintiffs and the Classes)

130.    Plaintiffs incorporate the above allegations as if fully set forth herein.

131.    Plaintiffs and Class Members provided their non-public PII to Defendant as a part of Defendant's offer for online sales.

132.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII were wrongfully disclosed.

133.    By assuming the responsibility to collect and store this data, Defendant had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

134.    Defendant had duties to employ reasonable security measures under Section 5 of

the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

135.    Defendant's duty to use reasonable security measures also arose under the common law, and as informed by the FTC Act, which mandates that Defendant implement reasonable cybersecurity measures.

136.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

137.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiffs and Class Members of the Data Breach.

138.    Defendant had and continues to have duties to adequately disclose that the PII of Plaintiffs and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice is necessary to allow Plaintiffs and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

139.    Defendant breached its duties, pursuant to the FTC Act, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

      a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b.  Failing to adequately monitor the security of its networks and systems, including by failing to implement reasonable monitoring, logging, and alerting systems such as EDR/XDR, data loss prevention tools, and a centralized security event management system;

c.  Allowing unauthorized access to Class Members' PII;

d.  Failing to detect in a timely manner that Class Members' PII had been compromised;

e.  Failing to remove Plaintiffs' and Class Members' PII it was no longer required to retain pursuant to regulations; and

f.  Failing to implement a reasonable cybersecurity incident response plan that would have enabled Defendant to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so they could take appropriate steps to mitigate the potential for identity theft and other damages.

140.  Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and Class Members.

141.  Defendant's violation of the FTC Act also constitutes negligence *per se*, as those provisions are designed to protect individuals like Plaintiffs and the proposed Class Members from the harms associated with data breaches.

142.  Defendant has admitted that the PII of Plaintiffs and Class Members was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

143.  But for Defendant's wrongful and negligent breaches of duties owed to Plaintiffs and Class Members, the PII of Plaintiffs and Class Members would not have been compromised.

144.    There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiffs and Class Members and the harm, or risk of imminent harm, suffered by Plaintiffs and Class Members. The PII of Plaintiffs and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

145.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

146.    As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

147.    Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures

30

to protect the PII in its continued possession.

148.    Plaintiffs and Class Members are therefore entitled to damages, including restitution and unjust enrichment, declaratory and injunctive relief, and attorneys' fees, costs, and expenses.

149.    Given Defendant's failures to implement the proper systems, as defined above, even knowing the ubiquity of the threat of data breaches, Defendant's decision not to invest enough resources in its cyber defenses amounts to gross negligence.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Classes)**

150.    Plaintiffs incorporate the above allegations as if fully set forth herein.

151.    Plaintiffs and the proposed Class Members transferred their PII to Defendant as a part of Defendant's offer for online sales.

152.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendant with their PII. In exchange, Defendant should have provided adequate data security for Plaintiffs and Class Members and implicitly agreed to do so.

153.    Defendant knew that Plaintiffs and Class Members conferred a benefit on it in the form their PII as a necessary part of receiving healthcare.

154.    Defendant, however, failed to secure Plaintiffs and Class Members' PII and, therefore, did not provide adequate data security in return for the benefit Plaintiffs and Class Members provided.

155.    If Plaintiffs and Class Members knew that Defendant had not reasonably secured their PII, they would not have allowed it to be provided to Defendant.

156.    The contract at least implicitly required Defendant to reasonably protect Plaintiffs'

and Class Members' PII.

157.    Defendant, however, failed to secure Plaintiffs and Class Members' PII, as detailed above.

158.    Moreover, all contracts include a covenant of good faith and fair dealing in negotiations and in performing the contract, and such good faith requires that Defendant use industry standard, expected, and commercially reasonable means to safeguard the PII that force their customers to provide—especially knowing the harm that would result from a data breach should it fail to provide such industry standard protections.

159.    If Plaintiffs and Class Members knew that Defendant had not reasonably secured their PII, they would not have allowed it to be provided to Defendant.

160.    Notwithstanding its legal obligations, Defendant failed to implement reasonable cybersecurity measures and thus allowed notorious cybercriminals access to Plaintiffs' and Class Members' PII.

161.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

## COUNT III
### BREACH OF BAILMENT
### (On Behalf of Plaintiffs and the Classes)

162.     Plaintiffs incorporate the above allegations as if fully set forth herein.

163.     Plaintiffs conveyed their PII to Defendant lawfully as a part of Defendant's offer for online sales with the understanding that Defendant would return or delete their payment card information once the transaction was completed and prevent it from being intercepted while it was in use.

164.     Defendant accepted this PII on the implied understanding that Defendant would honor its obligations under federal regulations, state law, and industry standards to safeguard Plaintiffs' PII and act on the PII only within the confines of the purposes for which Defendant collected Plaintiffs' PII.

165.     By accepting Plaintiffs' data and storing it on its systems, Defendant had exclusive control over the privacy of Plaintiffs' data in that Plaintiffs had no control over whether Defendant's copy of Plaintiffs' PII was protected with sufficient safeguards and indeed only Defendant had that control.

166.     By failing to implement reasonable cybersecurity safeguards, as detailed above, Defendant breached this bailment agreement causing harm to Plaintiffs in the form of violations of their right to privacy and to self-determination of who had/has access to their PII, in the form of requiring them to spend their own valuable time responding to Defendant's failures, and in the form of forcing Plaintiffs and the Class to face years of substantially increased risk of identity theft and financial fraud.

## COUNT IV
## INVASION OF PRIVACY
### (On Behalf of Plaintiffs and the Classes)

167.    Plaintiffs incorporate the above allegations as if fully set forth herein.

168.    Plaintiffs and Class Members took reasonable and appropriate steps to keep their PII, including their payment card information, confidential from the public.

169.    Plaintiffs' and Class Members' efforts to safeguard their own PII were successful, until Defendant failed to protect the same.

170.    Plaintiffs and Class Members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

171.    Defendant owed a duty to its customers, including Plaintiffs and the proposed Class Members, to keep their PII confidential.

172.    The unauthorized release of PII, including payment card information with its attendant security information, is highly offensive to any reasonable person.

173.    Plaintiffs' and Class Members' PII is not of legitimate concern to the public.

174.    Defendant knew or should have known that Plaintiffs' and Class Members' PII was private, as any reasonable person would.

175.    Defendant caused the publicized of Plaintiffs' and Class Members' PII to cybercriminals by failing to implement reasonable cybersecurity measures while being substantially certain that such a failure would lead to a data breach.

176.    Indeed, such substantial certainty is clear given the ubiquity of data breaches.

177.    Moreover, the disclosure meets the definition of a publication because the disclosure was done to the exact people from whom cybersecurity measures are meant to protect

Plaintiffs and the Class—such that those identity thieves and fraudsters are in a special relationship with Plaintiffs and the Class.

178.    Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members in that Defendant's inadequate data security measures will likely result in additional data breaches. Plaintiffs and Class Members have no adequate remedy at law for the injuries that they will sustain in that a judgment for monetary damages will not prevent further invasions of the Plaintiffs' and Class Members' privacy by Defendant.

**COUNT V**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Classes)**

179.    Plaintiffs incorporate the above allegations as if fully set forth herein.

180.    This Count is brought in the alternative to Count II, Breach of Implied Contract.

181.    Plaintiffs and Class Members conferred a monetary benefit on Defendant, by providing Defendant with their valuable PII. In so conferring this benefit, Plaintiffs and Class Members understood that part of the benefit Defendant derived from the PII would be applied to data security efforts to safeguard the PII.

182.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII.

183.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

184.    Under the principles of equity and good conscience, Defendant should not be

permitted to retain the monetary value of the benefit belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

185.    Defendant acquired the monetary benefit and PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

186.    If Plaintiffs and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

187.    Plaintiffs and Class Members have no adequate remedy at law.

188.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in their continued possession and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

189.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

190.   Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them.

**COUNT V**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW (UCL)**
**Cal. Bus. & Prof. Code § 17200, et seq.**
**(On behalf of Plaintiff Pearce and the California Subclass)**

191.   Plaintiff Pearce incorporates the above allegations as if fully set forth herein.

192.   Defendant engaged in unlawful and unfair business practices in violation of Cal. Bus. & Prof. Code § 17200, et seq. which prohibits unlawful, unfair, or fraudulent business acts or practices ("UCL").

193.   Defendant's conduct is unlawful because it violates the California Consumer Privacy Act of 2018, Civ. Code § 1798.100, et seq. (the "CCPA"), and other state data security laws.

194.   Defendant stored the PII of Plaintiff Pearce and the California Subclass in its computer systems and knew or should have known it did not employ reasonable, industry standard, and appropriate security measures that complied with applicable regulations and that would have kept Plaintiff Pearce's and the California Subclass's PII secure to prevent the loss or misuse of that PII.

195.   Defendant failed to disclose to Plaintiff Pearce and the California Subclass that their PII was not secure. However, Plaintiff Pearce and the California Subclass were entitled to assume, and did assume, that Defendant had secured their PII. At no time were Plaintiff Pearce and the California Subclass on notice that their PII was not secure, which Defendant had a duty to disclose.

196.   Defendant also violated California Civil Code § 1798.150 by failing to implement and maintain reasonable security procedures and practices, resulting in an unauthorized access and

exfiltration, theft, or disclosure of Plaintiff Pearce's and the California Subclass's nonencrypted and nonredacted PII.

197.    Had Defendant complied with these requirements, Plaintiff Pearce and the California Subclass would not have suffered the damages related to the data breach.

198.    Defendant's conduct was unlawful, in that it violated the CCPA.

199.    Defendant's acts, omissions, and misrepresentations as alleged herein were unlawful and in violation of, inter alia, Section 5(a) of the Federal Trade Commission Act.

200.    Defendant's conduct was also unfair, in that it violated a clear legislative policy in favor of protecting consumers from data breaches.

201.    Defendant's conduct is an unfair business practice under the UCL because it was immoral, unethical, oppressive, and unscrupulous and caused substantial harm. This conduct includes employing unreasonable and inadequate data security despite its business model of actively collecting PII.

202.    Defendant also engaged in unfair business practices under the "tethering test." Its actions and omissions, as described above, violated fundamental public policies expressed by the California Legislature. See, e.g., Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendant's acts and omissions thus amount to a violation of the law.

203.    Instead, Defendant made the PII of Plaintiff Pearce and the California Subclass accessible to scammers, identity thieves, and other malicious actors, subjecting Plaintiff Pearce and the California Subclass to an impending risk of identity theft. Additionally, Defendant's conduct was unfair under the UCL because it violated the policies underlying the laws set out in the prior paragraph.

204.    As a result of those unlawful and unfair business practices, Plaintiff Pearce and the California Subclass suffered an injury-in-fact and have lost money or property.

205.    For one, on information and belief, Plaintiff Pearce's and the California Subclass's stolen PII has already been published—or will be published imminently—by cybercriminals on the dark web.

206.    The injuries to Plaintiff Pearce and the California Subclass greatly outweigh any alleged countervailing benefit to consumers or competition under all the circumstances.

207.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the misconduct alleged in this complaint.

208.    Therefore, Plaintiff Pearce and the California Subclass are entitled to equitable relief, including restitution of all monies paid to or received by Defendant; disgorgement of all profits accruing to Defendant because of its unfair and improper business practices; a permanent injunction enjoining Defendant's unlawful and unfair business activities; and any other equitable relief the Court deems proper.

### COUNT VI
### VIOLATIONS OF THE CALIFORNIA CONSUMER PRIVACY ACT ("CCPA")
### Cal. Civ. Code § 1798.150
### (On behalf of Plaintiff Pearce and the California Subclass)

209.    Plaintiff Pearce incorporates the above allegations as if fully set forth herein.

210.    Defendant violated California Civil Code § 1798.150 of the CCPA by failing to

implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the nonencrypted PII of Plaintiff Pearce and the California Subclass. As a direct and proximate result, Plaintiff Pearce and the California Subclass's nonencrypted and nonredacted PII was subject to unauthorized access and exfiltration, theft, or disclosure.

211.    Defendant is a "business" under the meaning of Civil Code § 1798.140 because Defendant is a "corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners" that "collects consumers' personal information" and is active "in the State of California" and "had annual gross revenues in excess of twenty-five million dollars ($25,000,000) in the preceding calendar year." Civil Code § 1798.140(d).

212.    Plaintiff Pearce and California Subclass Members seek injunctive or other equitable relief to ensure Defendant hereinafter adequately safeguards PII by implementing reasonable security procedures and practices. Such relief is particularly important because Defendant continues to hold PII, including Plaintiff and California Subclass members' PII. Plaintiff Pearce and California Subclass members have an interest in ensuring that their PII is reasonably protected, and Defendant has demonstrated a pattern of failing to adequately safeguard this information.

213.    Pursuant to California Civil Code § 1798.150(b), Plaintiff Pearce mailed a CCPA notice letter to Defendant's registered service agents, detailing the specific provisions of the CCPA that Defendant has violated and continues to violate. If Defendant cannot cure within 30 days— and Plaintiff believes such cure is not possible under these facts and circumstances—then Plaintiff intends to promptly amend this Complaint to seek statutory damages as permitted by the CCPA.

214.    As described herein, an actual controversy has arisen and now exists as to whether Defendant implemented and maintained reasonable security procedures and practices appropriate

to the nature of the information so as to protect the personal information under the CCPA.

215.    A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendant.

**COUNT VII**
**VIOLATION OF THE CALIFORNIA CONSUMER RECORDS ACT**
**Cal. Civ. Code § 1798.80, et seq.**
**(On behalf of Plaintiff Pearce and the California Subclass)**

216.    Plaintiff Pearce incorporates the above allegations as if fully set forth herein.

217.    Under the California Consumer Records Act, any "person or business that conducts business in California, and that owns or licenses computerized data that includes personal information" must "disclose any breach of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82. The disclosure must "be made in the most expedient time possible and without unreasonable delay" but disclosure must occur "immediately following discovery [of the breach], if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Id (emphasis added).

218.    The Data Breach constitutes a "breach of the security system" of Defendant.

219.    An unauthorized person acquired the personal, unencrypted information of Plaintiff Pearce and the California Subclass.

220.    Defendant knew that an unauthorized person had acquired the personal, unencrypted information of Plaintiff Pearce and the California Subclass but waited approximately 287 days to notify them. Given the severity of the Data Breach, 287 days was an unreasonable delay.

221.    Defendant's unreasonable delay prevented Plaintiff Pearce and the California

Subclass from taking appropriate measures from protecting themselves against harm.

222.    Because Plaintiff Pearce and the California Subclass were unable to protect themselves, they suffered incrementally increased damages that they would not have suffered with timelier notice.

223.    Plaintiff Pearce and the California Subclass are entitled to equitable relief and damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE**,** Plaintiffs, on behalf of themselves and all Class Members, requests judgment against Defendant and that the Court grant the following:

A.    For an Order certifying this action as a class action and appointing Plaintiffs and their counsel to represent the Class, pursuant to Federal Rule of Civil Procedure 23;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PII, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all

applicable regulations, industry standards, and federal, state, or local laws;

iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

v.    prohibiting Defendant from maintaining the PII of Plaintiffs and Class Members on a cloud-based database;

vi.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access

controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix.    requiring Defendant to conduct regular database scanning and securing checks;

x.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xi.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.    requiring Defendant to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are

appropriately configured, tested, and updated;

xiv.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xv.    for a period of 7 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of actual damages, compensatory damages, and nominal damages, in an amount to be determined, and for punitive damages, as allowable by law;

E.    For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

F.    Pre- and post-judgment interest on any amounts awarded; and

G.    Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated: February 25, 2025                    Respectfully submitted,

                                            /s/ John F. Garvey
                                            John F. Garvey, #35879 (MO)
                                            Colleen Garvey, #72809 (MO)
                                            Ellen A. Thomas, #73043 (MO)
                                            **STRANCH, JENNINGS & GARVEY, PLLC**
                                            Peabody Plaza
                                            701 Market Street, Suite 1510
                                            St. Louis, MO 63101
                                            Tel: (314) 390-6750
                                            jgarvey@stranchlaw.com

cgarvey@stranchlaw.com
ethomas@stranchlaw.com

Grayson Wells, # 73068 (MO)
J. Gerard Stranch, IV*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gwells@stranchlaw.com
gstranch@stranchlaw.com

James J. Rosemergy #111477 (MO)
**CAREY DANIS & LOWE**
8235 Forsyth Blvd., Suite 1100
Clayton, MO 63105
Tel.: 314-725-7700
Fax: 314-721-0905
jrosemergy@careydanis.com

Andrew J. Shamis, Esq.
Leanna A. Loginov, Esq.*
**SHAMIS & GENTILE**
14 NE 1st Ave., Suite 705
Miami, FL 33132
Tel: (305) 479-2299
ashamis@shamisgentile.com

Marc H. Edelson*
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N300
Newtown, PA 18940
Tel: (215) 867-2399
medelson@edelson-law.com

*\* Pro Hac Vice admitted or forthcoming*

**Counsel for Plaintiffs and the Proposed Class**